(No. 46555.—

GENERAL TIME CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*—(Charles Meade, Appellee.)

*Opinion filed January 30, 1975.*

RYAN, J., took no part.

Angerstein & Angerstein, of Chicago (Charles Wolff, of counsel), for appellant.

John F. Keefe, of Chicago, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Charles Meade claimed an injury to his left eye on March 9, 1968, while operating a machine in his employment at General Time Corporation. An arbitrator of the Industrial Commission denied Meade's claim under the Workmen's Compensation Act (Ill. Rev. Stat. 1969, ch. 48, par. 138.1 *et seq.*) and held that while the claimant had sustained an accidental injury arising out of and in the course of his employment, he had failed to prove a causal relationship between the injury and his present disability. After receiving additional medical testimony and after argument, the Industrial Commission affirmed the denial of the claim. The circuit court of Cook County reversed the decision of the Commission and remanded to the Commission with directions to enter an award in favor of the claimant. The Industrial Commission accordingly entered an award in favor of the claimant and the award was affirmed by the circuit court. The employer, General Time Corporation, has appealed to this court.

Charles Meade was employed as a machinist by General Time Corporation on March 9, 1968. He had been wearing glasses for 18 years to correct a nearsighted condition. He testified that while removing metal particles that had accumulated on the wheel of a grinding machine, some particles were thrown from the revolving wheel, striking a glass shield attached to the machine. The claimant testified: "something hit me in the left eye"; and he assumed that a particle had bounced off the shield into his eye. He estimated the size of a particle thrown from the grinder to have been two one-thousandths or three one-thousandths of an inch. At his foreman's suggestion, he washed his eye out with water, returned to work but did not continue working on the grinder. The next day the claimant told his foreman that his vision was "blurry" and that he was seeing black spots through his left eye. There were no medical facilities at the plant, and the foreman

directed him to the employment office, where one of the personnel employees provided him with eye drops. For three or four more days he continued to use eye drops but his vision was getting darker and "blurrier." At his request, the employer referred him to a physician who administered salve, and a patch was applied to his eye. After two days, the claimant testified that he removed the patch and observed that his vision in the left eye was getting "blurrier" and darker.

He continued working until June 3, 1968, despite continuing visual difficulties. He testified that prior to June he repeatedly (5 times) asked his foreman to send him to an eye specialist and that each time he did the foreman sent him to the personnel department employee for eye drops. The employer, on June 3, did refer him to Dr. V. A. Kilikonis, an eye specialist, who, after examination, referred him to an eye surgeon, Dr. Paul Hauser. Dr. Hauser hospitalized him the following day and performed surgery for a retinal detachment at the Evanston Hospital.

A physical examination, which included an eye examination, had been given the claimant by the employer before he was hired, and he was found fit for employment.

Dr. Morris Bennin, an ophthalmologist, testified that he had examined the claimant on May 20, 1969, and had found that he had had surgery for a detached retina and that he was highly myopic. He stated that the claimant's vision in the left eye was 2/400, correctible to 20/200 with glasses. The witness said that in his opinion there was a causal connection between the speck which the claimant said struck his eye and the subsequent retinal detachment. He based his opinion on the fact that highly myopic individuals are much more prone to retinal detachments, that the claimant probably jerked his head or rubbed his eye, which would have been sufficient to detach the retina, and that a particle entering the eye from the grinding wheel could have torn the retina. The doctor testified that the loss of vision due to a detachment can be gradual. He

said, too, that retinal detachments can occur without any trauma and that in nearsighted persons they may occur simply from a natural growth of the eye.

Another ophthalmologist, Dr. Burton Russman, testified before the Industrial Commission that a highly myopic individual, as the claimant was, is more apt to develop retinal detachment if subjected to a trauma. It was possible and probable, in his opinion, after an examination of the claimant, that his retinal detachment occurred as a result of the particle entering his eye. He acknowledged that traumatic detachment of the retina typically requires a concussive force and that detachments can occur in myopic individuals spontaneously without any determined reason, or from disease or degeneration.

Dr. Vernon Page, also an ophthalmologist, testified for the employer that after examining Meade his opinion was that the particle which supposedly struck the claimant's eye did not cause the retinal detachment. He stated that such minute particles do not have sufficient mass to have a concussive effect on the eye and that there was no evidence that the eyeball had been penetrated by a particle. Either a concussion or penetration would be necessary to cause traumatic detachment, he stated. He further testified that in his opinion the claimant's retinal detachment occurred spontaneously as a result of retinal degeneration.

Dr. Sherman Shapiro, who is an ophthalmologist, testified for the employer that in his opinion the particle which the claimant said struck his eye did not cause the retinal detachment. He based this on his belief that the particle could not have been thrown into the claimant's eye with sufficient velocity to penetrate the eyeball, that there was no clinical evidence of penetration, that there were indications from the hospital record that retinal degeneration had been present, and that, more importantly, the claimant suffered from severe myopia, which was, he said, an important predisposing factor to detachment

without trauma.

In workmen's compensation cases the claimant has to show that the injury complained of arose out of and in the course of his employment. (*Brown v. Industrial Com.*, 57 Ill.2d 313, 316; *Hannibal, Inc. v. Industrial Com.*, 38 Ill.2d 473, 475.) But he need not prove that the employment was the sole cause of his injury or even the principal cause. It is sufficient if he shows it was a cause of the injury. (*Kerz v. Industrial Com.*, 51 Ill.2d 319.) A court reviewing findings of the Industrial Commission will reverse the findings if they are contrary to the manifest weight of the evidence. *Kerz v. Industrial Com.*, 51 Ill.2d 319.

We consider, as did the two reviewing judges of the circuit court of Cook County, that the manifest weight of the evidence required a finding in favor of the claimant.

It is of course true that where there is conflicting medical testimony a reviewing court may not substitute its view of the testimony for that of the Commission. But here we have more than simply conflicting medical testimony as to causation. We have the uncontradicted testimony of the claimant that "something" hit him in the left eye as he operated the grinding machine. His complaint was immediate. He was unable that day and thereafter to return to work on the grinding machine. The day after the accident his vision was "blurry" and he was seeing black spots through the injured eye. The eye did not improve; the deterioration of his vision was uninterrupted.

Prior to his accident the claimant, though highly myopic, had good corrected vision. This court said in *Plano Foundry Co. v. Industrial Com.*, 356 Ill. 186, 198-9: "Proof of the state of the health of the employee prior to and down to the time of the injury, and the change immediately following the injury and continuing thereafter, is competent as tending to establish that the impaired condition was due to the injury." The claimant testified he repeatedly asked to be sent to an eye specialist "because I was going blind." When expert examination was

finally provided he was at once hospitalized and prepared for surgery.

We judge that according to the manifest weight of the evidence the claimant's undisputed accident was, as a minimum, a cause of his resulting condition.

For the reasons given, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.